(747 P.2d 850)

No. 60,166

FIRST BANK & TRUST, a corporation, *Appellee*, v. FRANK NOVAK, JR., and OPAL L. NOVAK, a/k/a OPAL LOUISE NOVAK, *Appellants*.

Opinion filed December 10, 1987.

*Dan E. Turner* and *Phillip L. Turner*, of Topeka, for the appellant Frank Novak, Jr.

*William E. Metcalf*, of Metcalf and Justus, of Topeka, for the appellant Opal L. Novak.

*Aubrey G. Linville* and *Dana P. Ryan*, of Clark, Mize & Linville, Chartered, of Salina, for the appellee.

Before ABBOTT, C.J., STEVEN P. FLOOD, District Judge, assigned, and BARRY A. BENNINGTON, District Judge, assigned.

ABBOTT, C.J.: This is an appeal by Frank Novak, Jr., and Opal L. Novak from a judgment holding that a deed from their son Robert L. Novak and his wife Maleta J. Novak was void and of no effect, pursuant to K.S.A. 33-102, and allowing First Bank and Trust to foreclose its mortgage against the real estate described in the void deed, subject to the unpaid balance owing to Frank and Opal.

Frank and Opal contend that the contract of sale prohibition against assignment, coupled with a forfeiture provision, prevents First Bank from enforcing its partial assignment, mortgage, and

deed. They also contend the deed from their son and daughter-in-law was not a fraudulent conveyance.

The case was submitted on these stipulated facts:

On January 23, 1975, Frank and Opal entered into a Contract for Sale of Real Estate with their son and daughter-in-law for an installment sale of the following described real estate:

"The Southeast Quarter (SE ¼) of Section Eighteen (18), Township Six (6) South, Range Four (4) West of the Sixth (6th) Principal Meridian, in Cloud County, Kansas."

The contract provided that Robert and Maleta would pay Frank and Opal $20,000 for the land. $10,000 was to be paid in ten annual installments of $1,000, plus interest at six percent per annum on the unpaid balance, commencing November 1, 1975. The remaining $10,000 was to be paid in a lump sum on or before November 1, 1985, plus interest thereon at the rate of six percent per annum. The contract contained the following clause:

"IT IS HEREBY AGREED BY THESE PARTIES that this agreement is to be binding on the heirs, executors, administrators, and assigns, of the respective parties, but that *this contract may not be assigned without the written consent of the Sellers.*" (Emphasis added).

Payments were recorded on the back of the contract. Eight annual payments, totaling $8,000 principal, plus interest, were paid through November 1, 1982. The unpaid balance on the contract is $12,000, plus interest at the contract rate.

On April 25, 1979, Robert and Maleta executed and delivered to First Bank a note in consideration of an SBA secured loan of $113,000. To secure the note, Robert and Maleta, on the same day, executed and delivered to First Bank a Conditional Assignment and Transfer of all of their interest in the land, a real estate mortgage, a quitclaim deed, and a security agreement covering "contract rights" and other personal property. However, First Bank did not obtain the consent of Frank and Opal to the assignment. Part of the loan proceeds was used to build a Quonset milk barn on the land. The land was occupied by Robert and Maleta as their homestead.

The mortgage and assignment were recorded in the Cloud County Register of Deeds' office on May 8, 1979, and the mortgage registration fee was paid. The quitclaim deed is held by First Bank and has not been recorded. Financing statements

and continuation statements were filed in Cloud County and with the Secretary of State, perfecting a security interest in contract rights and other described property.

On August 28, 1979, National Farmers Union Property and Casualty Company added the name of Fidelity State Bank, Concordia, Kansas (predecessor to First Bank) to Frank's insurance policy on the land.

On June 9, 1983, Robert and Maleta filed a petition for Chapter 11 relief in the United States Bankruptcy Court for the District of Kansas, and the land was listed as an asset in their schedules.

On January 25, 1984, Kansas Mutual Insurance Co. issued a change endorsement to its policy taken out by Robert and Maleta, adding First Bank and Frank as additional insureds.

On February 29, 1984, Robert and Maleta filed their disclosure statement and debtors' plan of reorganization in the bankruptcy court. The land was included as part of the reorganization plan, and Frank and First Bank were listed as creditors of Robert and Maleta. Copies of the disclosure statement and plan were served on Frank and Opal.

On October 14, 1984, Kansas Mutual Insurance Company issued a declarations sheet on Robert and Maleta's farmowners' policy, naming First Bank and Frank as mortgagees.

On February 19, 1985, the bankruptcy judge entered an order denying confirmation of Robert and Maleta's Chapter 11 plan.

On March 6, 1985, Frank and Opal filed for Chapter 11 relief in the United States Bankruptcy Court for the District of Kansas, listing the land as an asset in their bankruptcy schedules. Paragraph 16 of the statement of business affairs stated that no property had been returned to or repossessed by Frank and Opal during the year immediately preceding the filing of their petition.

On April 1, 1985, Robert and Maleta's Chapter 11 proceedings were dismissed. Two days later, on April 3, 1985, Robert and Maleta executed a joint tenancy quitclaim deed to Frank and Opal on the land, which was recorded in the office of the Register of Deeds of Cloud County, Kansas, on April 4, 1985.

On May 20, 1985, Robert and Maleta filed for Chapter 7 bankruptcy relief in the United States Bankruptcy Court for the District of Kansas. Their statement of financial affairs referred to

a contract cancellation on the land, and stated that a lease was to be negotiated between Frank and Opal and Robert and Maleta on the land.

The bankruptcy court granted relief from the stay to permit First Bank to file this action to determine the validity of the mortgage on the land. This action was filed on March 17, 1986. Robert and Maleta were served the same day and are in default. They are indebted to First Bank on the secured note in the amount of $82,403.41 principal and $4,623.32 accrued interest through August 26, 1985, plus $23.71 interest per day from August 27, 1985, until paid.

On June 18, 1986, the bankruptcy court dismissed Frank and Opal's Chapter 11 proceedings.

The trial court ruled the assignment was valid, based on the decisions of *Badger v. Parker*, 85 Kan. 134, 116 Pac. 242 (1911), and *Murray First Thrift and Loan Co. v. Stevenson*, 534 P.2d 909 (Utah 1975).

*Badger v. Parker*, while not directly on point, does lend some insight into the present case. Highly summarized, the defendant in *Badger* entered into a contract with an investment company for the sale of a tract of land. He paid $1,500 down and agreed to make yearly payments of $500 until the purchase price was paid, and to pay interest, taxes, and insurance. He paid the first $500 installment and the first interest payment, but defaulted on the second interest payment. After the contract was entered into, but before default occurred, defendant made certain purchases from plaintiff (a lumber company) for improvements upon the land. When the plaintiff was unable to collect its bill from defendant, its agent induced the defendant and his wife to assign their interest in the real estate contract to plaintiff. This assignment was in writing and acknowledged, and was given after the defendant had defaulted on the second interest payment. The contract between the seller and defendant provided for forfeiture, upon default in any payments, of all payments theretofore made and all improvements made on the land. The contract also provided that defendant could not assign the contract without the written consent of the seller. The assignment to plaintiff was without the written consent of the seller.

The appellees in *Badger* (which did not include the defendant

for reasons not relevant to the present appeal) argued that defendant's interest in the land reverted *ipso facto* to the seller upon default of the second interest payment and, therefore, defendant had nothing to assign. In the alternative, the appellees argued that even if defendant had a remaining interest in the land, the assignment was void because it was entered into without the written consent of the seller. The Supreme Court disagreed, stating: "While the stipulation would protect the investment company from forced acceptance of an undesirable assignee as purchaser, it did not preclude Parker [defendant] from using this interest and investment as property, which it was, for the purpose of securing his debt." 85 Kan. at 138.

The trial court in the present case held that the purchasers' assignment was not an attempt to force an undesirable assignee on the defendants; the purchasers were simply using the interest in the property to secure a debt. The purchasers had a substantial interest in the land. They had paid 40% of the purchase price, and they had used the loan to make improvements on the land.

On appeal, the defendants argue the rationale of *Badger* should not apply to this case because the contract was between a father and his son; the prohibition against assignment and the forfeiture clause was intended to guarantee the sellers' son would have the property at a price he could afford, not merely to protect defendants from an undesirable assignee as purchaser. While it is true that *Badger* may be factually distinguished from the present case, that case recognizes the proposition that a purchaser under a real estate contract has a property interest which is assignable as security for a debt, even in the presence of a contract provision prohibiting the assignment of the contract without the written consent of the seller.

The trial court found: "The restriction in the contract was solely against assignment of the contract. There is no restriction against using the contract and the purchasers' equity as security for a loan." The trial court cites 77 Am. Jur. 2d, Vendor and Purchaser §§ 399, 400, in support:

"However, where a provision against the assignability of a contract for the sale of land is not followed by any provision for the forfeiture of the contract, the assignment thereof does not operate to forfeit the contract or confer an excuse for the vendor's refusal to carry it out, if the obligations of the vendee under the

contract are due and have been fully performed or duly tendered by him or the assignee. The assignment is enforceable in equity notwithstanding the restriction against assignment, where it appears that the restriction was in the nature of a mere security for the performance of the principal covenants, and where such enforcement appears equitable under the circumstances of the case."

"In the interpretation of a clause in a contract for the sale of real estate, restricting the assignment of the contract by the purchaser, the tendency of the courts is to limit the scope of the restriction. Thus, a restriction against the assignment of a land contract has been held not to preclude an assignment as collateral security, at least where the purchaser has made valuable improvements on the property or has paid a large part of the purchase money . . . ."

The trial court also relied on *Murray First Thrift and Loan Co. v. Stevenson*, 534 P.2d 909, to support its decision. In *Murray*, the purchasers under a uniform real estate contract assigned their interest in the contract to First Thrift as security for a loan. The real estate contract prohibited the assignment of the contract without the written permission of the sellers. The assignment to First Thrift was without the written permission of the sellers. The purchasers went into bankruptcy after the assignment was made and First Thrift tendered the full amount due and owing under the contract and demanded a deed to the realty. The sellers refused to tender the deed on the ground the assignment was void and of no effect, since their written permission had not been obtained. First Thrift brought an action for declaratory judgment to protect its security interest in the real estate. The trial court granted summary judgment, the sellers appealed, and the Supreme Court of Utah affirmed, noting:

"Since there was no provision for forfeiture for assigning the contract, the assignment is merely a breach which might render the purchaser liable for damages, if any, which might be occasioned the sellers. It would not cause a forfeiture of the contract. The plaintiff tendered to the sellers the balance due and owing, and so there can be no damages sustained by reason of the assignment.

"There is another reason why the sellers cannot refuse to convey title to the property, to wit: The assignment in the instant matter was not an assignment as contemplated in the contract whereby the purchasers undertake to get somebody else to take over the obligation of making the payments. It was an assignment of their equity in the contract as security only for the loan which they were getting from the plaintiff herein. There is ample authority to sustain the foregoing proposition."

The trial court in the present case, after citing *Murray*, stated that there was no forfeiture provision in the contract before it. As

defendants point out, this is an incorrect statement of fact; the contract did have a forfeiture provision. However, this incorrect or incomplete statement by the trial judge is not fatal to this case because the forfeiture provision of the contract relates to forfeiture upon failure to make payments, and does not mention forfeiture upon the purchasers' assignment of their interest in the contract as security for a loan. The trial court should have said, or more clearly stated, that there was no forfeiture provision in the contract for assigning the contract.

Defendants argue that the case of *Fakes v. Osborne*, 165 Kan. 176, 193 P.2d 218 (1948), is directly on point and supports their position that the assignment in this case was invalid.

*Fakes* is not directly on point. In that case, the purchasers assigned all their rights under a real estate contract to the appellant. *The assignment was not made as security for a debt.* The appellant in *Fakes* actually took possession of the real estate under the contract and complied with the terms of the contract. The sellers forcibly ejected him from possession of the real estate and appellant sued for an accounting and for possession. The contract between the sellers and the purchasers of the land provided that the contract was not assignable by the purchasers without the written consent of the sellers until $10,000 of the payments were paid. There was no indication that the sellers consented to the assignment. The sellers filed a motion to compel the appellant to state whether there had been a written consent to the assignment or a payment of $10,000, and if so to give times, amounts, and manner of payments. The motion was granted, and the appellant amended his petition. The amended petition was still inadequate, and sellers demurred on the ground that appellant had not stated facts sufficient to constitute a cause of action. The trial court sustained the demurrer and appellant appealed. Our Supreme Court held that the appellant's amended petition failed to allege facts showing the right of the purchasers to assign their interest in the contract and affirmed the judgment of the trial court.

A restriction against assignment is a restraint on alienation, and as such it is strictly construed against the party urging the restriction. *Wood v. Hatcher*, 199 Kan. 238, 243, 428 P.2d 799 (1967). The contract before us does not provide for forfeiture

upon assignment of the contract, only upon default. First Bank also mentions Article 9 of the Uniform Commercial Code as a possible basis for rejecting the nonassignability clause in the contract. Article 9 is inapplicable to the facts of this case. See Clark, The Law of Secured Transactions Under the Uniform Commercial Code ¶ 1.8(10)[a] n.235 (1980).

Defendants argue that, contrary to the finding of the trial court, since a forfeiture clause *did* follow the nonassignability clause, the contract should be interpreted to mean that *any* assignment gives the seller a right to immediate possession of the property as well as damages for breach. First, the forfeiture provisions *precede* the nonassignability clause and, second, the forfeiture provisions do not speak to forfeiture upon assignment of the contract. Defendants were not entitled to possession just because an assignment was made. They argued to the trial court that they had a right of possession upon default, but did not argue that they had a right of possession upon assignment. "A point not raised before the trial court may not be raised for the first time on appeal." *Lostutter v. Estate of Larkin*, 235 Kan. 154, Syl. ¶ 6, 679 P.2d 181 (1984).

The defendants argue the trial court erred in applying equitable estoppel. Based on the record before us, the doctrine of equitable estoppel is not applicable to this case. This trial error is of little consequence because the trial court otherwise correctly held the assignment to be valid.

The trial court held that the deed signed by Robert and Maleta on April 3, 1985, whereby they attempted to convey the land to the defendants, was void under the provisions of K.S.A. 33-102, which provides:

"Every gift, grant or conveyance of lands, tenements, hereditaments, rents, goods or chattels, and every bond, judgment or execution, made or obtained with intent to hinder, delay or defraud creditors of their just and lawful debts or damages, or to defraud or to deceive the person or persons who shall purchase such lands, tenements, hereditaments, rents, goods or chattels, shall be deemed utterly void and of no effect."

The trial court cited *Koch Engineering Co. v. Faulconer*, 239 Kan. 101, 105, 716 P.2d 180 (1986), as the most recent case outlining the nature of a fraudulent conveyance and the six badges or indicia of fraud. However, it did not rule on which of

the six badges of fraud were present in this case. Defendants argue the court's finding on this point is insupportable because there is no evidence that the purchasers had the intent to hinder, delay, or defraud their creditors, namely First Bank. They argue the purchasers were *required* to convey the land to defendants, under the circumstances of the case, because purchasers had failed to make payments as required under the contract. The purchasers could not have conveyed the land any earlier because of the automatic stay in bankruptcy.

"Badges of fraud are circumstances frequently attending conveyances and transfers intending to hinder, delay, or defraud creditors. They are red flags, and when they are unexplained in the evidence, they may warrant an inference of fraud. Some are weak; others are strong. One weak badge of fraud, standing alone, would have little evidentiary value in establishing a fraudulent conveyance. For example, the mere fact that grantor and grantee are related, standing alone, would not support a finding that the conveyance was fraudulent. On the other hand, the concurrence of several badges of fraud are said to make out a strong case." 239 Kan. at 107.

The elements of a fraudulent conveyance and the six enumerated badges or indicia of fraud are set out in *Koch*:

" 'In general, the elements which comprise a fraudulent conveyance are first, an intent on the part of the grantor to hinder, delay or defraud his creditors and second, the participation of the grantee in such fraudulent scheme or such knowledge on the latter's part of facts and circumstances as would import knowledge of the fraud to him. This court has recognized six badges or indicia of fraud. The badges or indicia of fraud are: (1) a relationship between the grantor and grantee; (2) the grantee's knowledge of litigation against the grantor; (3) insolvency of the grantor; (4) a belief on the grantee's part that the contract was the grantor's last asset subject to a Kansas execution; (5) inadequacy of consideration; and (6) consummation of the transaction contrary to normal business procedures.' " 239 Kan. at 105.

Here, the grantors are the son and daughter-in-law of the grantees. The grantees knew the grantors had filed for bankruptcy by late February 1984 *at the latest*, when copies of the grantors' bankruptcy disclosure statement and reorganization plan were served on the grantees. The disclosure statement noted First Bank's interest in the real estate by virtue of the assignment. The reorganization plan provided that First Bank would be paid the value of the grantor's equity in the real estate. The grantees, therefore, knew of First Bank's interest in the real estate prior to the conveyance.

The grantors had filed for bankruptcy under Chapter 11 before the conveyance was made. The bankruptcy court denied confirmation of the grantors' reorganization plan on February 19, 1985, and ordered that grantors be given ten days to convert the case to a Chapter 7 case. If the case was not converted to a Chapter 7 within 10 days, the case was to be dismissed on March 4, 1985. The parties stipulated that the grantors' Chapter 11 proceedings were dismissed on April 1, 1985. The conveyance was made two days later. A month and a half later grantors filed for Chapter 7 bankruptcy relief. The deed was conveyed for one dollar and other valuable consideration.

The land was deeded by Robert and Maleta to Frank and Opal without any foreclosure proceeding; no rights of redemption were given either to Robert and Maleta or First Bank, even though Frank and Opal were aware of First Bank's mortgage. There is substantial evidence of a clear and convincing nature in the record to support a finding that the conveyance was fraudulent.

Affirmed.